**SOCIETY HILL TOWERS OWNERS' ASS'N, Robert D. Greenbaum, Zoe Coulson, John Q. Lawson, Jeremy Siegel, Penelope Batcheler, Gray Smith, and Roxanne Galeota, Plaintiffs,**

v.

**Edward G. RENDELL, Mayor of the City of Philadelphia, City of Philadelphia, Andrew M. Cuomo, Secretary of the United States Dep't of Hous. and Urban Dev., and United States Dep't of Hous. and Urban Dev., Defendants.**

No. Civ.A. 97–4778.

United States District Court,
E.D. Pennsylvania.

Sept. 16, 1998.

M. Melvin Shralow, White and Williams, Philadelphia, PA, for plaintiffs.

Steven A. Arbittier, William H. Gelles, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, for Edward G. Rendell, City of Philadelphia, defendants.

John J. Pease, U.S. Attorney's Office, Philadelphia, PA, James G. Sheehan, Assistant U.S. Attorney–Civil Division, Philadelphia, PA, Margaret L. Hutchinson, U.S. Attorney's Office, Philadelphia, PA, for Andrew M. Cuomo, defendant.

John J. Pease, James G. Sheehan, Margaret L. Hutchinson, (See above), for United States Department of Housing and Urban Development, defendant.

## MEMORANDUM

### EDUARDO C. ROBRENO, District Judge.

Plaintiffs Society Hill Towers Owners Association ("the Association") and other residents of the Society Hill neighborhood in Philadelphia, Pennsylvania (collectively "plaintiffs")[1] brought this action seeking judicial review of a decision by the United States Department of Housing and Urban Development ("HUD") to approve an Urban Development Action Grant ("UDAG") in the amount of $10 million awarded to the City of Philadelphia ("the City") to assist in funding the public portion of the development cost of a 350–room hotel and 500–vehicle parking garage in the Penn's Landing section of the Delaware River waterfront ("the project").[2]

Plaintiffs seek declaratory judgment that the City did not follow the procedures mandated by the applicable statutes and regulations in conducting the environmental and historical reviews, and that, in turn, HUD improperly approved the City's application. Plaintiffs also seek to enjoin the City and HUD from carrying out the provisions of the UDAG agreement executed by the City and HUD until all environmental and historical reviews mandated by the applicable statutes and regulations have been properly conducted.

Specifically, plaintiffs argue that: 1) the City failed to comply with the applicable environmental statutes and regulations and that the finding by the City that the project would have no significant impact on the environment is arbitrary, capricious, without adequate foundation, based upon an incomplete and inadequate environmental review record, and is an abuse of discretion; 2) HUD failed to perform its responsibilities under the applicable statutory and regulatory framework when it approved the City's revised fifth amendment request, and that the approval is arbitrary, capricious, without adequate foundation, and an abuse of discretion; 3) the procedures used by HUD, and the procedures used by the City and "accepted" by HUD, are inconsistent with, and not permitted by, the applicable statutory framework; and 4) the City and HUD failed to take into account the impact of the proposed project on the historic structures and districts in the area, pursuant to the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*, and that the City and HUD failed to afford the Advisory Council on Historic Preservation an opportunity to comment on the proposed project. In addition to declaratory and injunctive relief, plaintiffs seek counsel fees and costs. Both sets of defendants generally respond that all the procedures mandated under the relevant statutes and regulations

---

1. Individual plaintiffs in this case are Robert D. Greenbaum, Zoe Coulson, John Q. Lawson, Jeremy Siegel, Penelope Batchelor, Gray Smith, and Roxanne Galeota.

2. The UDAG Agreement number is B–86–AA–42–0180.

were followed and that accordingly the request for relief should be denied.

Before the Court are cross-motions for summary judgment.[3] For the reasons stated below, the Court will grant defendants' motion for summary judgment, deny plaintiffs' motion for summary judgment, and enter judgment in favor of defendants and against plaintiffs on all counts.

## I. FACTS

The following facts gleaned from the administrative record are uncontested or viewed in the light most favorable to plaintiffs:[4]

1. In 1986, the City filed an application with HUD seeking approval of a UDAG grant in the amount of $10 million to assist in funding the public portion of the development cost of a festival park at Penn's Landing ("the first application"). (Fed.A.R.1.)

2. The application received preliminary approval by HUD, and a grant agreement between HUD and the City was executed later that year ("1986 UDAG agreement"). (Fed.A.R.2–4.)

3. Over the next several years, at the City's request, HUD granted several extensions of time to allow prospective developers opportunities to submit proposals for the festival park. (Fed.A.R.5–25.)

4. After the first application was approved, the City proposed four amendments to the first application. *Id.* HUD approved each of these requests for amendments, and, thereafter, amended grant agreements were executed. *Id.* The festival park, as proposed

in the first application and the subsequent amendments, however, was never developed and the grant funds were never dispersed.

5. In September 1994, the City made a request for yet a fifth amendment to the 1986 UDAG agreement, now proposing the use of the Penn's Landing site solely for the construction of a 350–room hotel and 500–vehicle garage. (Fed.A.R.27–28.) This request for a fifth amendment constituted a "whole new project" separate and distinct from the festival park proposed in the original plan and in the previous approved amendments. (Fed. A.R.29) It is HUD's approval of this request for a fifth amendment and the subsequent approval of a revised request for a fifth amendment to the 1986 UDAG agreement, that are implicated in this case.

6. In November 1994, HUD approved the City's request for a fifth amendment. However, as a condition to the execution of an amended grant agreement, HUD required, in essence, that the City hold public hearings. (Fed.A.R.29–30.)

7. On November 16, 1994, the City, acting through the Philadelphia Industrial Development Corporation ("PIDC"),[5] published a notice of hearings to be held on November 21, 1994. (Fed .A.R. 31.)

8. On November 21, 1994, the City held two hearings. One was held at 2:00 p.m., and the other at 6:00 p.m. Thirteen people attended these hearings.[6] (*Id.*)

9. On November 29, 1994, the City certified to HUD that the City had complied with the hearing requirements prescribed by HUD. (*Id.*)

---

**3.** The City also has filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), alleging plaintiffs lack standing to bring this lawsuit. In this summary judgment posture, however, the Court will assume that plaintiffs have standing and will reach the merits of plaintiffs' claims. *See, e.g., Richland Park Homeowners Ass'n Inc. v. Pierce,* 671 F.2d 935, 941 n. 3 (5th Cir.1982) (assuming standing in summary judgment posture in NEPA case, despite recognizing that plaintiffs may not meet standing requirements, in order to reach merits); *Loatman v. Summit Bank,* No. 95–5258, 1997 WL 809772, at *5 (D.N.J. Aug.29, 1997) (assuming standing in summary judgment posture in order to reach merits of claims).

**4.** · To the extent that both sides have given these uncontested facts conflicting interpretations, the Court has accepted plaintiffs' version of the uncontested facts.

**5.** PIDC is the City agency to whom the responsibility of administering the UDAG was delegated.

**6.** Plaintiffs note that these hearings were attended by few people, all of whom were proponents of the project, except for a reporter from the *City Paper,* which plaintiffs characterize as a "free newspaper of limited circulation." (Pls.' Mem. at 19.)

10. From December 1994 to May 1995, a group of local residents, some of whom are plaintiffs in this case, contacted City and HUD officials objecting to the development of the project, as detailed in the request for a fifth amendment. (Fed.A.R.32–35, 37–42.)

11. On June 30, 1995, plaintiffs filed suit in this Court seeking to stop HUD from executing a new grant agreement based upon the request for the fifth amendment ("the 1995 lawsuit").[7]

12. On October 5, 1995, HUD notified the City that, in connection with the City's request for a fifth amendment, the City had not complied with certain certification requirements, including those pertaining to environmental review and citizen participation. (Fed.A .R. 36.)

13. On October 11, 1995, the City, in response to HUD's October 5, 1995 request, supplied, *inter alia,* environmental and public participation certifications. (Fed.A.R.43.)

14. On December 5, 1995, the Court dismissed the 1995 lawsuit without prejudice for lack of subject matter jurisdiction because plaintiffs could not allege that there had been final agency action by HUD approving the City's request for a fifth amendment.[8]

15. On August 6, 1996, and August 15, 1996, after publishing notice, the City held additional hearings on the project described in the request for the fifth amendment. (Fed.A.R.52.) Those hearings, unlike those held in November 1994, were well-attended. The administrative record contains letters from the public, responses from the City, attendance sheets, and transcripts of these hearings. (IV Fed.A.R.–VII Fed.A.R.; III City A.R.–VII City A.R.)

16. On August 15, 1996, while at a hearing called by the City to hear public comments on the request for the fifth amendment, Ms. Barbara Kaplan, executive director of the City Planning Commission, announced that a finding of no significant impact ("FONSI") and a notice of intent/request for the release of funds ("NOI/RROF") by the City would soon issue. (City A.R.2036, 2176–77.) At the time these comments were made, the environmental review by the City had not been completed. (*Id.*)

17. On August 22, 1996, the City published the FONSI and NOI/RROF. (Fed. A.R.64.) In response, plaintiffs submitted technical studies and comments to the City challenging the City's findings. (Fed. A.R.54–55.) Plaintiffs also made submissions to HUD challenging the environmental assessment which resulted in the FONSI. (Fed.A.R. 62, 65, 66, 69; City A.R. 0173–0475). HUD referred these objections to the City and notified plaintiffs that, under the statutory scheme, because HUD had delegated environmental review to the City, it would only consider procedural and not substantive objections to the City's findings. (Fed. A.R.70, 72.)

18. On October 23, 1996, HUD informed the City that the request for a fifth amendment was still defective, and "suggested" to the City that the request for a fifth amendment be withdrawn and not resubmitted until the City complied with all regulatory requirements. (Fed.A.R.73.)

19. On December 21, 1996, the City published a second FONSI and NOI/RROF. (Fed.A.R.79–81.) Public comments to this FONSI and NOI/RROF were received from December 21, 1996 to January 21, 1997. (City A.R. 2409–2541).

20. On January 22, 1997, the City submitted to HUD an RROF and Environmental Certification. (Fed.A.R. 81; City A.R. 2589–2590.)

21. On February 3, 1997, HUD notified plaintiffs' counsel that it would accept objections to the RROF and related environmental certifications until February 12, 1997. (Fed. A.R.82.)

---

7. *See Society Hill Towers–Owners' Ass'n v. Rendell,* No. 95–4100.

8. *See id.* (doc. no. 25). Plaintiffs, citing to their "supplemental record," and referring to a certification by the City to HUD, (Fed.A.R.43), complain that the City was trying to "slide by without true public participation while the matter was before this Court." (Pls.' Mem. at 22.)

22. On February 5, 1997, plaintiffs' counsel submitted to HUD objections to the second FONSI/RROF. (Fed.A.R.78.)

23. On February 21, 1997, the City withdrew its request for a fifth amendment. (Fed.A.R.75.) On the same day, the City submitted a revised request for a fifth amendment. The revised request described physically the same project as was described in the request for a fifth amendment, i.e., a 350–room hotel and 500–vehicle parking garage. While the project was substantively the same, the developer and financing arrangements were different. (Fed.A.R.86.) Together with the revised request for a fifth amendment, the City also submitted to HUD the environmental review record ("ERR"). (Fed.A.R. 76–77 (application materials); IV Fed.A.R. – VII Fed.A.R. (ERR).)

24. On May 20, 1997, HUD approved the revised request for a fifth amendment. (Fed.A.R.89.)

25. On June 11, 1997, HUD notified the City that the revised request for a fifth amendment had been approved. (Fed.A.R. 91; City A.R. 2618.)

26. On July 24, 1997, plaintiffs filed this lawsuit. (*See* doc. no. 1.)

27. On August 14, 1997, HUD notified the City that it had approved the City's RROF. (Fed.A.R. 91; City A.R. 2618.)

28. On September 22, 1997, HUD executed the fifth amended UDAG agreement based on the City's revised request for a fifth amendment to the UDAG. (Fed.A.R.93.) On October 14, 1997, the City executed the fifth amended UDAG agreement. *Id.*

## II. LEGAL STANDARD [9]

### A. *Administrative Procedure Act ("APA")*

Claims for review by a federal court of final agency action are determined under the Administrative Procedure Act ("APA"), unless another statute precludes such review. 5 U.S.C. § 702;[10] *see, e.g., Advanced Career Training v. Riley*, No. 96–7065, 1997 WL 476275, at *7 (E.D.Pa. Aug.18, 1997). The parties agree that the challenged actions in this case constitute "final action" and that review under the APA is appropriate. 5 U.S.C. § 704.

---

9. Summary judgment is appropriate if the moving party can "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ .P. 56(c). When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Court must accept the non-movant's version of the facts as true, and resolve conflicts in the non-movant's favor. *Big Apple BMW, Inc. v. BMW of N. Amer., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992).

The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has done so, however, the non-moving party cannot rest on its pleadings. *See* Fed.R.Civ.P. 56(e). Rather, the non-movant must then "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir.1992); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

10. The APA provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5 U.S.C. § 702.
Pursuant to the APA, the Court may:
hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent the facts are subject to trial de novo by the reviewing court
In making the foregoing determination, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
5 U.S.C. § 706(2).

In reviewing claims under the APA, the arbitrary and capricious standard of review applies. 5 U.S.C. § 706(2)(A).[11] This standard requires courts to make a "substantial inquiry." *C.K. v. New Jersey Dep't of Health and Human Servs.*, 92 F.3d 171, 182 (3d Cir.1996) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). While this inquiry "is to be searching and careful, the ultimate standard of review is a narrow one." *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814; *C.K.*, 92 F.3d at 182 (citing *id.*). Agency action "is entitled to a presumption of regularity," and "a court 'is not empowered to substitute its judgment for that of the agency.'" *Overton Park*, 401 U.S. at 415, 91 S.Ct. 814.[12]

The reviewing court's inquiry must "be based on the full administrative record that was before the [decisionmaker] at the time he made his decision." *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814; *C.K.*, at 182. *See also, Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) ("The factfinding capacity of the district court is thus typically unnecessary to judicial review of agency decisionmaking.") This review is conducted "based on the record the agency presents to the reviewing court." *Florida Power*, 470 U.S. at 743–44, 105 S.Ct. 1598 (citing *Overton Park*, 401 U.S. 402, 91 S.Ct. 814)). *Accord Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654–55, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990); *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (holding that the "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"); *C.K.*, 92 F.3d at 192.

The reviewing court must "consider whether the decision was based on consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814; *C.K.*, 92 F.3d at 182. If the record before the agency does not support the agency action, or if the agency has not considered all the relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, a court should remand to the agency for additional investigation or explanation. *Florida Power*, 470 U.S. at 744, 105 S.Ct. 1598; *C.K.*, 92 F.3d at 182. The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry. *Florida Power*, 470 U.S. at 744, 105 S.Ct. 1598; *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814; *Camp v. Pitts*, 411 U.S. at 142–43, 93 S.Ct. 1241; *C.K.*, 92 F.3d 171. The Supreme Court has said, "We will, however, uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoted by *C.K.*, 92 F.3d at 182).

In this case, in addition to the administrative record, plaintiffs have submitted to the Court, and have relied upon, a "Supplemental Record."[13] Supplementation of the

---

11. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (applying the arbitrary and capricious standard to case in which petitioner sought review of decision not to prepare supplemental EIS and stating that "the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance. . . ." *See also, Curry v. United States Forest Serv.*, 988 F.Supp. 541, 550 (W.D.Pa. 1997).

12. Plaintiffs, without citing to any case law, argue that an agency's interpretation of a statutory provision should not be accorded deference. (Pls.' Mem. at 47 n. 13.) To the contrary, as long as an agency's interpretation, as expressed in a promulgated regulation, is a reasonable construction of the statute, the court may defer to the agency's considered interpretation. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

13. This "supplemental record" consists of several letters from counsel to the Court, from plaintiffs' counsel to the City, and between counsel, and a hearing transcript, all relating to efforts to reach a compromise in the 1995 lawsuit, several letters from plaintiffs' counsel to the City, HUD, and HUD's counsel, all relating to the events subsequent to the 1995 lawsuit, computer-enhanced photographs of the project site, a petition signed by the public objecting to the project, several newspaper articles, a HUD environmen-

record, as suggested by plaintiffs, is not proper. If additional information is needed to reach an informed decision, the court must remand to the agency and may not consider plaintiffs' additional submissions unless plaintiffs have made "a strong showing of bad faith or other improper behavior [on the part of the agency]." *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814. The reason for this limitation is that "[t]o review more than the information before the Secretary at the time [he] made [his] decision risks our requiring administrators to be prescient or allowing them to take advantage of post hoc rationalizations." *Walter O. Boswell Memorial Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C.Cir.1984) (citing *American Petroleum Inst. v. Costle*, 609 F.2d 20, 23 (D.C.Cir.1979)).

In this case, plaintiffs' claims of bad faith are that defendants departed from the procedural requirements of the applicable statutes and regulations, and that they conducted a "sham" review. Because, as discussed below, the Court finds that defendants substantially satisfied the requirements under the statutory and regulatory scheme, and, further, because the Court finds that defendants' conduct was not a "sham," the Court concludes that the claim that the City acted in bad faith is without merit. The Court, therefore, will not consider the "supplemental record" submitted by plaintiffs.

### B. *National Historic Preservation Act*

Plaintiffs have also asserted a direct claim against HUD under § 106 of the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470f.[14] Plaintiffs claim that HUD did not properly consult with the Advisory

Council on Historic Preservation on the City's UDAG application as, they claim, is required by the statute.[15] "NHPA ... is primarily a procedural statute, designed to ensure that Federal agencies take into account the effect of Federal or Federally-assisted programs on historic places as part of the planning process for those properties." *Morris County Trust for Historic Preservation v. Pierce*, 714 F.2d 271, 278–79 (3d Cir. 1983).

### C. *Statutory and Regulatory Frameworks*

#### 1. *Urban Development Action Grant Program*

In 1977, Title I of the Housing and Community Development Act of 1974 ("HCDA") was amended to add the Urban Development Action Grant Program ("UDAG"). 42 U.S.C. § 5301 *et seq.;* HCDA, Pub.L. No. 95–128, § 110(b), 91 Stat. 1125, codified as amended at 42 U.S.C. § 5318. The purpose of the UDAG program is to "stimulate economic development activity needed to aid in economic recovery of cities and urban counties which are experiencing severe economic distress," by allowing such cities and counties to apply to HUD and compete for grants intended to stimulate private economic development. 42 U.S.C. § 5318.

HUD, as the agency charged with responsibility to administer the UDAG program, has promulgated a complex set of regulations governing the procedural requirements that grant applicants must meet before they may receive UDAG funds. *See* 24 C.F.R. subpt. G.[16] The regulations require preliminary ap-

---

tal review guide, and the City Planning Commission's plan for Center City, Philadelphia.

**14.** The Third Circuit has recognized that, generally, a private right of action exists under NHPA. *See Boarhead Corp. v. Erickson*, 923 F.2d 1011, 1017 (3d Cir.1991). Defendants do not contest this assertion.

**15.** The statute provides:

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the ap-

proval of the expenditure of Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such federal agency shall afford the Advisory Council on Historic Preservation established under part B of this subchapter a reasonable opportunity to comment with regard to such undertaking. 16 U.S.C. § 470f.

**16.** Title 24, Code of Federal Regulations subpart G was substantially revised in 1996, omitting several provisions discussed below. *See* 61 Fed.

864

proval by HUD of the grant application. The terms are then reduced to writing by HUD in a grant agreement executed by HUD and the grant recipient.

Before the agreement may be executed, however, the grant applicant must fulfill its responsibilities for environmental review, decision making, and action set forth in 42 U.S.C. 5304(g). The applicant must also submit to the Secretary of Housing and Urban Development ("the Secretary"), at least 15 days prior to the release of funds for the project, a request for the release of funds ("RROF") and a certification pursuant to 42 U.S.C. § 5304(g)(3).[17] The certification must include an agreement by the applicant to undertake environmental and historic review responsibilities in connection with the project. 42 U.S.C. 5304(g). See, e.g., Fed.A.R. 81. Thus, under HCDA and the accompanying HUD regulations, the UDAG recipient "assume[s] the status of a ... Federal official" charged with fulfilling the substantive requirements of the applicable statutory and regulatory framework. 42 U.S.C. § 5304(g)(3)(D); 24 C.F.R. § 58.4. Lastly, the grant applicant must also submit evidence of "legally binding private commitments" between the applicant and participating public and private parties to HUD for approval before HUD may release the funds for the project. 24 C.F.R. § 570.460 (before Apr. 19, 1996).

Prior to the submission of a full application, the applicant must: (1) hold hearings to obtain the views of the area residents; (2) analyze the impact of the proposed activities on area residents and on the neighborhood, and hold hearings to obtain the views of the citizens; (3) complete an environmental assessment ("EA") of the result such project will have on the environment and determine whether or not a full environmental impact statement ("EIS") need be prepared and comply with historic preservation and review procedures; and (4) satisfy the requirements for funding relating to flood and drainage facilities. See 24 C.F.R. 570.454 (before Apr. 19, 1996).

Thus, while HUD is authorized to delegate the task of completing environmental and historic review to the grant applicant, HUD retains final authority for ensuring that the grant applicant adheres to the proper statutory and regulatory procedures. See 24 C.F.R. § 58.75.

HUD regulations, rather than the statute, govern the procedure for post preliminary approval of project amendments and revisions. 24 C.F.R § 570.461 (before Apr. 19, 1996); 20 C.F.R. § 570.463(b) (after Apr. 19, 1996). Under the regulations in effect in 1997, when the decision regarding the revised request for a fifth amendment in this case was made, if the amendment is considered "significant," i.e., it "involves new activities or alterations thereof which will change the scope, location, scale, or beneficiaries of such activities or which, as a result of a number of smaller changes, add up to an amount that exceeds ten percent of the grant," then HUD may approve the amendments provided:

Reg. 11474 (1996) (effective Apr. 19, 1996). However, the new subpart G, incorporated the standards of the old subpart G by reference. See infra part III.A.

17. The provision sets forth the requirements for the certification:
A certification under the procedures authorized by this subsection shall—
(A) be in a form acceptable to the Secretary,
(B) be executed by the chief executive officer or other officer of the recipient of assistance under this chapter qualified under the regulations of the Secretary,
(C) specify that the recipient of assistance under this chapter has fully carried out its responsibilities as described under paragraph (2) of this subsection, and

(D) specify that the certifying officer (i) consents to assume the status of a responsible Federal official under the National Environmental Policy Act of 1969 [42 U.S.C. § 43421 et seq.] and each provision of law specified in regulations issued by the Secretary insofar as the provisions of such Act or other such provision of law apply pursuant to paragraph (1) of this subsection, and (ii) is authorized and consents on behalf of the recipient of assistance under thus subchapter and himself to accept the jurisdiction of the Federal courts for the purpose of enforcement of his responsibilities as such an official.
42 U.S.C. § 5304(g)(3).

"[the amended application] meet[s] the criteria for selection applicable at the time of receipt of the program amendment; (2) the recipient must have complied with all requirements of [the UDAG subpart of Title 24, Code of Federal Regulations]; (3) the recipient may make amendments other than those requiring prior HUD approval as defined in paragraph (c) of this section but each recipient must notify both the Area and Central Offices of such changes."

*Id.*

### 2. National Environmental Policy Act ("NEPA")

 The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, "is primarily a procedural statute" that was "designed to ensure that environmental concerns are integrated into the very process of agency decisionmaking." *Morris County*, 714 F.2d at 274 (citing *Andrus v. Sierra Club*, 442 U.S. 347, 350, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979). Another purpose is to inform the public that environmental concerns are taken into account by an agency in its decisionmaking process. *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *Morris County*, 714 F.2d at 275 (citing *Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 142–43, 102 S.Ct. 197, 70 L.Ed.2d 298 (1981)). NEPA's mandate is that agencies take a "hard look" at environmental consequences before taking major action. *Baltimore Gas*, 462 U.S. at 97, 103 S.Ct. 2246 (cited by *Morris County*, 714 F.2d at 274).

To that end, HUD has promulgated regulations to satisfy the NEPA requirements throughout the UDAG process.[18] These regulations establish environmental review procedures for grant recipients who assume HUD's NEPA responsibilities. Unless a project is considered an exempt or a categorically excluded activity, 24 C.F.R. § 58.36, the grant recipient must prepare an environmental assessment ("EA"),[19] 24 C.F.R. § 58.36, which requires that the grant recipient generate an environmental review record ("ERR") containing certain required material, 24 C.F.R. 58.38. After performing the EA and compiling the ERR, the agency may either make a finding of no significant impact ("FONSI"), meaning that the "project is not an action that will result in a significant impact on the quality of the human environment," 42 U.S.C. § 4332(2)(c); 24 C.F.R. § 58.40(g)(1), or the agency may make a finding of significant impact, 24 C.F.R. § 58.40(g)(2). If a FONSI is issued, the grant recipient must then publish a notice of intent to request the release of funds ("NOI/RROF"). 24 C.F.R. §§ 58.43, 58.70. Thereafter, there is a period for public comment. 24 C.F.R. § 58.45. Only after compliance with this requirement may the grant recipient file a request for the release of funds ("RROF"). 24 C.F.R. §§ 58.70–58.72. If the agency makes a finding of significant impact, it must prepare an environmental impact statement ("EIS"), which is more detailed that an EA, 24 C.F.R. §§ 58.37, 58.60, and a record of decision ("ROD"), 24 C.F.R. § 58.60(e). The EIS process is exhaustive and detailed. Therefore, it is burdensome and costly. For these reasons, it is reserved for "significant" projects. *See Citizen Advocates for Responsible Expansion, Inc. v. Dole*, 770 F.2d 423, 428 n. 4 (5th Cir.1985). Regularly, many more EAs are compiled

---

**18.** These regulations were promulgated pursuant to a directive from the Council on Environmental Quality ("CEQ"), the agency charged with implementing NEPA. HUD's NEPA regulations track similar CEQ provisions. *See* 40 C.F.R. parts 1500–1508.

**19.** The CEQ regulations provide:

"Environmental Assessment:"

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or of finding of no significant impact.

(2) Aid an agency's compliance with [NEPA] when no environmental impact statement is necessary.

(3) Facilitate preparation of one when necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives required by section 102(2)(E) [of NEPA], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9.

than EISs. In fact, federal agencies prepare approximately 30,000 EAs annually, but only some 1,000 EISs. *Lower Alloways Creek Township v. Public Serv. Elec. & Gas Co.,* 687 F.2d 732, 740 n. 17 (3d Cir.1982). Thus, the EA serves as a "screening device" to reserve scarce resources for "truly important federal actions." *Id.* (citing *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 858 (9th Cir.1982).

## III. DISCUSSION

### A. *Public Participation Requirements and General Procedural "Irregularities"*

Plaintiffs first complain that the City did not comply with statutory and regulatory requirements that public hearings be held prior to the submission of the City's requests for a fifth amendment, and that HUD, in turn, approved the application despite the non-compliance. Plaintiffs point to HCDA, 42 U.S.C. § 5318, HUD regulations, 24 C.F.R. § 570.454(a), (b)(2), NEPA, 16 U.S.C. § 470f, HUD's regulations requiring NEPA compliance and implementing NEPA requirements, 24 C.F.R. § 570.458(c)(14)(vii), (viii), and finally, CEQ regulations, 40 C.F.R. §§ 1500.1(b), 1501.7(a), 1506.6.

Specifically, as to the City, plaintiffs argue that: 1) the City did not comply with the notice and hearing requirements of the regulations; 2) the hearings were held by an advocate for the project, rather than an im-

partial body; and 3) the City's actions did not follow in the proper sequence prescribed by the statutory and regulatory frameworks. Plaintiffs claim that, in essence, the devices the City used for public participation, e.g., the notices published, the hearings held, and the comments received, were a "sham," and "were conducted only for technical compliance and never had any impact on the decisions already made by the City," (Pls.' Mem. at 15).[20]

As to HUD, plaintiffs claim that by not correcting these flaws, HUD did not properly review the City's actions. Plaintiffs also claim that HUD was without authority to approve the project because, at the time the revised request for a fifth amendment was made, the HUD regulations authorizing the filing of new UDAG applications had been deleted from the HUD regulations in effect.

The City responds that it fully complied with all notice and hearing requirements. First, the City points out that the requirements under the UDAG regulations and under the NEPA framework are procedurally distinct and should be analyzed separately. In connection with the NEPA mandated environmental review, the City contends that no public hearings are required in connection with an environmental review. Rather, the regulations only require that the agency afford the public an opportunity to comment in writing on the City's finding. 24 C.F.R. §§ 58.43, 58.45.[21] The City claims that, pur-

**20.** Plaintiffs argue the following to support their conclusion that the procedures the City used both prior to and after the public hearings violated the law: (1) that the City made two earlier attempts to "evade" public hearings; (2) that the residents of the neighborhood learned of the proposed project through the newspaper and wrote to HUD for "help;" (3) plaintiffs' received no "help" from HUD or the City and were forced to file the 1995 lawsuit; (4) that even though the procedures used by defendants were "confused and confusing," HUD refused to directly respond to inquiries from plaintiffs' counsel; (5) an additional public hearing was scheduled without explanation; (6) the additional hearings were "a facade without substance;" (7) the hearings were conducted by advocates for the project; (8) the audience at the hearings were falsely told that HUD would review the transcripts; (9) the results were announced before the hearings were concluded, and, (10) thus the results were a "done deal;" (11) other neighborhood meetings

produced no "meaningful participation;" (12) the hearings could have no impact on the site selected by the developer; (13) the administrative record omits "important" exhibits; (14) the City and the developer admitted that this is not a convention hotel, despite widespread belief that the City needs a conference hotel; (15) HUD "confirmed" that the City was not in compliance with the law; (16) that the post-hearing chronology is the reverse of that mandated by the statutory and regulatory framework; and (17) the regulations governing significant amendments to UDAG agreements were rescinded prior to the City's submission of its revised request for amendment.

**21.** The City argues that it, in fact, went beyond the minimum requirements of the regulations, and actually coded and considered the concerns raised at the hearings in the environmental review process. (City A.R. 0731–0736, 16520–2389.) The City also points out that new traffic

suant to these regulations, it published notice of its finding on August 22, 1996, and received public comments for a period of 30 days thereafter. (Fed.A.R.64.)

In connection with HUD's UDAG regulations, the City points out that public hearings were indeed held. 24 C.F.R. § 570.424(a), (b). Moreover, according to the City, nothing in the regulations required them to respond in any particular way to concerns raised at the hearings; nor was the City required to have the proceedings of the hearing transcribed. In any event, the City contends that a transcript of the hearings was provided by plaintiffs to the City and was included in the ERR. *See* City A.R. 0737–1477.

In response to plaintiffs' complaint that the hearings were held by a partial body, in this case, PIDC, an agency controlled by the City, the City points out that this situation is inherent in the UDAG process because, under the applicable framework, the grant recipient is responsible for holding the hearings. Plaintiffs point to no rule which prohibits the City from designating a city agency to conduct the required public hearings.

The City disagrees that it did not follow the correct sequence of procedures mandated by statute and regulation governing the application, consideration, and granting of UDAG amendments, by conducting the hearings *after* the request for a fifth amendment had been submitted. The City notes that the statute does not prescribe a particular sequence in which the mandated events must take place. Rather the City argues, that what the regulations provide, is for the City to certify to HUD *prior* to the release of funds that all requirements under the UDAG regulations, such as those requiring public hearings and an environmental review, had been met, 24 C.F.R. § 570.458. The City points out that all such requirements were met in connection with the City's most recent amendment request, i.e., the February 1997

revised request for a fifth amendment, before the request for the release of funds was made and that the sequence in which they were met is not relevant.

In turn, HUD responds that it properly reviewed the City's compliance with the statutory and regulatory requirements for public hearings and comments. Specifically, HUD points to hearings held which were properly publicized, and well-attended. Further, HUD identifies the FONSI and NOI/RROF that were published, and points to the public comment invited and received. Because all procedural requirements were met, HUD argues all of their duties were properly discharged.

■ The Court agrees that the City did not improperly deviate from the mandated procedure and that HUD's approval was proper. In the first place, the statutory and regulatory framework dictates no particular sequence for the fulfillment of procedural obligations; nor do plaintiffs point to any prejudice which resulted from the City's choice for the order in which the various procedural requirements were fulfilled. The claim that the sequence in which the City complies with the various requirements under the regulations caused plaintiffs the opportunity to timely comment at the various stages of the regulatory process is belied by the record which shows that plaintiffs commented often, vigorously, and at all relevant points during the approval process. Secondly, the Court finds that the City's certification that public hearings were held, that the impact on local residents was analyzed, that such analysis was made available to residents, that historic properties which will be affected by the project were identified and the effect on these properties was then taken into account, and that the City agreed to comply with historic preservation requirements was correct. In reaching this conclusion, the Court notes the following: [22]

analyses were included in the ERR as a result of public concern. (City A.R. 1547–1590.)

**22.** The statute provides in pertinent part:

Applicants for assistance under this section shall—

(1) in the case of an application for a grant under subsection (b)(2) of this section, include documentation of grant eligibility in accordance with the standards described in that subsection;

(2) set forth the activities for which assistance is sought, including (A) an estimate of

1) Citizen participation hearings pursuant to 24 C.F.R. § 570.454(a) were held on August 6, 1996, (City A.R. 1650–1996), and neighborhood impact hearings pursuant to 24 C.F.R. § 570.454(b) were held on August 15, 1996, (City A.R.1997–2389; FedA.R. 52)), *see supra* at p. 6 ¶ 13;

2) A FONSI and NOI/RROF were published in *The Philadelphia Inquirer* pursuant to 24 C.F.R. §§ 58.43, 58.70 on August 22, 1996, (Fed.A.R.64), *see supra* at p. 6 ¶ 16;

3) Public comments on FONSI notice and NOI/RROF were accepted and considered pursuant to 24 C.F.R. § 58.45 from August 22, 1996 to September 26, 1996, (City A.R. 0173–0475); *see supra* at p. 6 ¶ 16;

4) The second FONSI notice and NOI/RROF were published in *The Philadelphia Inquirer* pursuant to 24 C.F.R. §§ 58.43, 58.70 on December 21, 1996, (City A.R. 2542); *see supra* p. 7 ¶ 18;

5) Comments to that notice were accepted and considered from December 21, 1996 to January 21, 1997, (City A.R. 2409–2541); 24 C.F .R. § 58.45.

6) The City submitted to HUD a RROF and Environmental Certification pursuant to 24 C.F.R. § 58.71 on January 22, 1997, (City A.R. 2589–2590); *see supra* at p. 7 ¶ 19;

7) The City submitted to HUD a request for a fifth amendment pursuant (the "revised request") to 24 C.F.R. § 570.463 on February 21, 1997, (Fed. A.R.75–76);

8) HUD approved the revised request pursuant to 24 C.F.R. § 570.463 by letter dated June 11, 1997, (City A.R. 2618); *see supra* at p. 7 at ¶ 20.

9) HUD approved the RROF by letter dated August 14, 1997. (City A.R. 2618); *see supra* at p. 8 ¶ 24; and

10) HUD and the City executed an amended UDAG Agreement pursuant to 24 C.F.R. 570.461 on September 22, 1997 and October 14, 1997 respectively, (Fed.A.R.93); *see supra* at p. 8 ¶ 25.

Because the City's actions satisfy the requirements of the statute and regulations, there were no procedural defects. Therefore, the Court concludes that the approval by HUD of the revised request for a fifth amendment was proper.

 Lastly, plaintiffs argue that because at the time the revised request for a fifth amendment was submitted by the City to HUD, the UDAG regulations covering the criteria for approval of UDAG grants had been deleted from the HUD regulations, HUD was without authority to approve this revised request. HUD replies that the deletion of the regulations was intended to

the costs and general location of the activities; (B) a summary of the public and private resources which are expected to be made available in connection with the activities, including how the activities will take advantage of unique opportunities to attract private investment; and (C) an analysis of the economic benefits which the activities are expected to produce;

(3) contain a certification satisfactory to the Secretary that the applicant, prior to submission of its application, (A) has held public hearings to obtain the views of citizens, particularly residents of the area in which the proposed activities are to be carried out; (B) has analyzed the impact of these proposed activities on the residents, particularly those of low and moderate income, of the residential neighborhood, and on the neighborhood in which they are to be carried out; and (C) has made available the analysis described in clause (B) to any interested person or organization residing or located in the neighborhood in which the proposed activities are to be carried out; and

(4) contain a certification satisfactory to the Secretary that the applicant, prior to submission of its application, (A) has identified all properties, if any, which are included on the National Register of Historic Places and which, as determined by the applicant, will be affected by the project for which the application is made; (B) has identified all other properties, if any, which will be affected by such project and which, as determined by the applicant, may meet the criteria established by the Secretary of the Interior for inclusion on such Register, together with documentation relating to the inclusion of such properties on the Register; (C) has determined the effect, as determined by the applicant, of the project on the properties identified pursuant to clauses (A) and (B); and (D) will comply with the requirements of section 5320 of this title.

42 U.S.C. § 5318(c).

streamline HUD's regulatory process in response to the Congressional determination to eliminate funding for *new* UDAG grants, but that under the new regulations, HUD provided for the approval of amendments to previously approved projects.

The Court agrees with HUD. At the time that the UDAG regulations were deleted in 1996, HUD also enacted new regulations, 61 Fed.Reg. 11474 (1996) (effective Apr. 19, 1996). The new regulations authorized the approval of amendments to previously approved UDAG grants for new or substantially altered activities provided that the activities included in the amendments "meet the criteria for selection applicable at the time of receipt of the program amendment," 24 C.F.R. § 570.463 (effective Apr. 19, 1996). In other words, rather than restating in the new regulations the criteria for approval of amendments in effect at the time the initial grant application was approved and which were contained in the deleted regulations, the new regulations incorporate the criteria set forth in the deleted regulations by reference. The effect is to require that any amendments to a previously approved project submitted under the current regulations must, nevertheless, be in conformity with the criteria spelled out in the deleted regulations. Therefore, the Court concludes that the HUD UDAG regulations in place at the time the revised request for the fifth amendment was approved provided HUD with the authority to approve the revised request.

## B. *Environmental Review*

Plaintiffs also complain that the preparation of the EA and the decision to issue a FONSI and thus not prepare an EIS were arbitrary, capricious, abuses of discretion, and otherwise not in accordance with law. Specifically, plaintiffs complain that: 1) the City failed to asses the "cumulative impacts" of the proposed project in the context of various plans in which the City contends the project is an integral part; (2) the City failed to consider "mitigating factors," such as alternative sites for the project; and (3) the

public controversy surrounding the project demands that an EIS be prepared.

### 1. *Cumulative impact or project aggregation analysis*

■ Plaintiffs claim that the City failed to take other nearby projects into account to determine whether the cumulative impact of those projects would require the compilation of an EIS as required by, inter alia, 24 C.F.R. § 58.32. Plaintiffs argue that while the City, in the ERR, has taken the position that the project is part and parcel of other larger plan or plans,[23] it conducted the review as if the project is unrelated to any other plans. Either way, plaintiffs contend, the review is flawed.

The City responds that for the purposes of the applicable regulations, the relevant project is only the proposed hotel and garage with no other activities integrally related to the hotel and garage. Further, the City argues, no other potential projects were sufficiently concrete to mandate their inclusion in the EA.

Under the "project aggregation" requirements of HUD regulations, the City was required to "group together and evaluate as a single project all individual activities which are related on either a geographical or functional basis, or are logical parts of a composite of contemplated actions." 24 C.F.R. § 58.32. For the purposes of the HUD regulations, a "project" is "an activity, or group of integrally related activities, designed by the recipient to accomplish, in whole or in part, a specific objective." 24 C.F.R. 58.2(4).

At issue is whether other plans for the Penn's Landing area were sufficiently related to the project such that a cumulative impact analysis was required. Some courts have articulated this "relatedness" test as whether the actions in question were "so interdependent that it would be unwise or irrational to complete one without the other." *Park County Resource Council, Inc. v. United States Dep't of Agric.*, 817 F.2d 609, 623 (10th Cir.1987) (quoting *Webb v. Gorsuch*, 699 F.2d 157, 161 (4th Cir.1983)), *overruled on other*

---

**23.** Specifically, plaintiffs point to references in the ERR to "The Comprehensive Use Plan," "The Plan for Center City," "The Penn's Landing Master Plan," "The Penn's Landing Development Plan," "The Central Riverfront District Plan," and "The River Walk Plan."

grounds, *Village of Los Ranchos De Albuquerque v. Marsh,* 956 F.2d 970 (10th Cir. 1992); *Airport Neighbors Alliance, Inc. v. United States,* 90 F.3d 426, 430 (10th Cir. 1996) (quoting *Park County,* 817 F.2d at 623);[24] *Sierra Club v. Froehlke,* 534 F.2d 1289, 1297–98 (8th Cir.1976); *Trout Unlimited v. Morton,* 509 F.2d 1276, 1285 (9th Cir. 1974). Other courts have looked for an "inextricable nexus" between the project at issue and other projects. *Save the Yaak Comm. v. Block,* 840 F.2d 714, 720–21 (9th Cir.1988). The Court concludes that under either formulation the City appropriately concluded that the relevant project was the proposed hotel and garage.

 First, the Court notes that the evidence does not suggest that the City could not sever any connection between the hotel and other projects without "destroying the proposed action's functionality." *See Airport Neighbors Alliance,* 90 F.3d at 431. Second, plaintiffs do not point to any evidence in the administrative record that realization of the future plans was, indeed, expected to materialize. NEPA only requires consideration of the cumulative impact of "proposed," and not merely "contemplated" future actions. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 10, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); 42 U.S.C. § 4332(c). Where "future development is unlikely or difficult to anticipate" there is no need to study cumulative impacts. *United States v. 27.09 Acres of Land,* 760 F.Supp. 345, 351 (S.D.N.Y.1991). Thus, the Court concludes that based on the record, the City was not required to conduct a cumulative impact analysis as part of the EA.

### 2. *Mitigating factors analysis*

 In addition to the "cumulative impact" or "project aggregation" analyses, the regulations also require that agencies explore "mitigating factors" or alternatives to the proposed action. 40 C.F.R. § 1508.9(b).[25] The type of alternatives the regulations envision include:

(a) Avoiding the impact altogether by not taking certain actions or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

40 C.F.R. § 1508.20.

Plaintiffs complain that the consideration of alternatives given by the City was "internally inconsistent." Specifically, plaintiffs argue that the City's reasoning for rejecting plaintiffs' and other critics' proposed alternative site is directly contradictory to the City's proposed "Welcome Partnership[26] Plan" for Penn's Landing. In this regard, plaintiffs point to the following: 1) while the City did not agree with plaintiffs and other critics of the proposed project that the location at the foot of Market Street rather than at Penn's Landing was more appropriate, the City provided in the "Welcome Partnership Plan" for a high rise office tower, similar to the proposed hotel, at the foot of Market Street; 2) while the reason the City rejected plaintiffs'

---

**24.** In *Airport Neighbors Alliance,* the Tenth Circuit, concluded that although a proposed new airport runway might be "linked" to other components of the Master Plan for the airport, "the City could sever this link by deciding to abandon the Master Plan without destroying the proposed action's functionality." *Airport Neighbors Alliance,* 90 F.3d at 431. Thus, the court held that the agency appropriately did not perform an analysis of the cumulative impacts of the runway and the other components of the Master Plan. *Id.*

**25.** The regulation provides that an EA:

Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9(b).

**26.** The Welcome Partnership is a real estate developer who was selected to develop a plan for Penn's Landing prior to the fifth amendment request.

and other critics' proposed alternative site was that the existing infrastructure in the historic areas could not support the project in that location because of proximity to the historical area, the same criticism applies to the Penn's Landing location; 3) the City made statements that although a portion of Penn's Landing could be used for an entertainment complex, there is, in fact, no interest for such a development. Plaintiffs refer to these developments as examples of the City's "spin doctoring," which, they argue, amounts to arbitrariness and caprice.

The City responds by pointing to the alternatives analysis section of the environmental review record, (City A.R. 1504), which the City contends actually reveals a thorough inquiry. The City further argues that, as a matter of law, the City's review was sufficient, because a responsible agency is not required to consider *all* possible alternatives in compiling an EA.

The Court agrees that the City's review was satisfactory. First, the Court recognizes that there are bounds to the alternatives analysis required by the regulations for the preparation of an EA. In this case, the City in making its finding of no significant impact, determined that an EIS was not required. While an EIS would require the City to perform a rigorous alternatives analysis, an EA would not. *See Mt. Lookout–Mt. Nebo Property Protection Ass'n v. Federal Energy Regulatory Comm'n,* 143 F.3d 165, 171 (4th Cir.1998). Rather, under the CEQ regulations, the City was required to "include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R.

§ 1508.9(b). *Id.* As the Eighth Circuit recognized:

> an EA is supposed to be 'a concise public document.' 40 C.F.R. 1508.9(a). It is supposed to '[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.' 40 C.F.R. § 1508.9(a)(1). An EA cannot be both concise and brief and provide detailed answers for every question.

*Sierra Club v. United States Forest Serv.,* 46 F.3d 835, 840 (8th Cir.1995).[27]

The Court's task is to review the record before the agency at the time of the decision to determine that all relevant factors were considered. The Court concludes in this case that they were, and, accordingly, will decline plaintiffs' invitation to substitute its judgment for that of the agency.

### 3. Public controversy

■ Finally, plaintiffs argue that "public outcry alone in this case demands preparation of an EIS." (Pls.' Mem. at 68.) The Court disagrees. Evidence of public controversy is a factor which an agency should consider when deciding whether to prepare an EIS. 40 C.F.R. § 1508.27(b)(4). *Northwest Environmental Defense Ctr. v. Bonneville Power Administration,* 117 F.3d 1520, 1535 (9th Cir.1997); *Friends of Ompompanoosuc v. Federal Energy Regulatory Comm'n,* 968 F.2d 1549, 1556–57 (2d Cir. 1992) However, it is not the sole factor the agency must consider, 40 C.F.R. § 1508.27(b). Moreover, there is no statutory mandate that one factor should be given more weight than any other. *Friends of Ompompanoosuc,* 968 F.2d at 1556–57 (citing *River Road Alliance v. Corps of Engineers of U.S. Army,* 764 F.2d 445, 449 (7th Cir.1985)).

**27.** Even if the City had found that the project would have a significant impact on the environment, and thus had to produce an EIS, the City would not be required to canvass every possible alternative. *See, e.g., Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) ("Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.

Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved."). *See also Committee to Preserve Boomer Lake Park v. Department of Transp.,* 4 F.3d 1543, 1551 (10th Cir.1993); *Fayetteville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1027 (4th Cir.1975) (all applying to the compilation of the more detailed EIS, rather than the EA).

The administrative record discloses that at public hearings and during the public comment period, the City received comments and objections from citizens. (City A.R. 0173–0475, 0731–1477, 2411–2541.) The comments generated at the hearing were coded and analyzed by the City. (City A.R. 0731–0736, 1650–2389.) In fact, the City responded individually in writing to a number of the objections raised by plaintiffs' counsel (prior to the initiation of this lawsuit). (City A.R. 0476–0730.) Further, studies were performed by the City in response to concerns raised by the public. (*See, e.g.,* City A.R. 0731–0736; 1547–1590.) That plaintiffs disagree with the City's substantive judgment, does not compel the Court to find fault with the City's calculus of decisionmaking. *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. Further, because the Court concludes that the City complied with the proper procedure, plaintiffs claims that HUD failed to correct flaws in the City's environmental review must be dismissed as well.

### C. *Historical Review*

 Plaintiffs assert a direct claim against HUD under the National Historic Preservation Act, 16 U.S.C. § 470f, for: (1) failing to "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" or (2) failing to "afford the Advisory Council on Historic Preservation established

under part B of this subchapter a reasonable opportunity to comment with regard to such undertaking." (Pls.' Mem. at 71 (quoting 16 U.S.C. § 470f)). Plaintiff s argue that the administrative record offers no evidence of HUD's compliance with these "mandatory acts," and requests that the Court "compel" HUD to comply. *Id.*[28]

HUD responds that it properly delegated all responsibility for environmental and historical review to the City. Therefore, compliance with the substantive provisions of the relevant statutes and regulations rests on the City rather than HUD. The Court agrees that HUD properly delegated the historic review responsibilities under NHPA to the City pursuant to HCDA, 42 U.S.C. § 5304(h). Therefore, as the designated agency official, the City was responsible for NEPA and NHPA substantive review. *See* P.L. 96–153, § 103(g), Dec. 21, 1979, 93 Stat 1101 (amending 42 U.S.C. § 5304).[29] *See, e.g., Landrieu,* 496 F.Supp. at 739. Congress has considered the appropriateness of the delegation of such responsibilities, and decided that the Secretary may delegate historic review responsibility to the grantee. Therefore, under the statutory scheme, while HUD is responsible for the City's procedural compliance, the City, rather than HUD, is responsible for performing the proper substantive historic review.

The City, in turn, responds that it, in fact, complied with the applicable statutory and

---

**28.** Plaintiffs further claim attorneys fees under NHPA. *See* 16 U.S.C. § 470w–4. Because the Court concludes that HUD did not violate NHPA, the Court does not reach that issue.

**29.** This HCDA provision was amended to permit the Secretary to delegate responsibilities other than those imposed by NEPA:

In order to assure that the policies [NEPA] and other provisions of law which further the purposes of such Act (as specified in regulations issued by the Secretary) are most effectively implemented in connection with the expenditure of funds under this chapter, and to assure to the public undiminished protection of the environment, the Secretary, in lieu of the environmental protection procedures otherwise applicable, may under regulations provide for the release of funds for particular projects to recipients of assistance under this chapter who assume all of the responsibilities for environ-

mental review, decisionmaking, and action pursuant to such Act, and such other provisions of law as the regulations of the Secretary specify, that would apply to the Secretary were he to undertake such projects as Federal projects. The Secretary shall issue regulations to carry out this subsection only after consultation with the Council on Environmental Quality.

42 U.S.C. § 5304(g)(1). The committee report explains the amendment:

The conferees are aware that there has been some confusion over whether the Secretary has the authority to delegate such authority with regard to acts other than [NEPA]. Specifically, the conferees wish to make clear that delegation can also be made with regard to [NHPA] ... as well as other acts which further the purposes of the NEPA.

Conf.Rep. No. 86–706, 96th Cong., 1st Sess. 45 (1979) (cited by *Landrieu,* 496 F.Supp. at 739).

regulatory frameworks, established by 16 U.S.C. § 470f, 36 C.F.R. part 801, and 24 C.F.R. part 58. The City claims that the environmental review record shows that after a thorough analysis of the effect of the project on cultural resources included, or eligible for inclusion, in the National Register of Historic Places, the City Historical Commission concluded that the Project would have "no effect on the Old City National Historic District, the U.S.S. Olympia or the U.S.S. Becuna, cultural resources entered on the National Register of Historic Places," (City A.R. 0047–0078), nor would it impact on sites eligible for inclusion in the National Register, (*id.*). The City further argues that the entity designated as the state historical preservation office for the purposes of NHPA, 16 U.S.C. § 470a, the Pennsylvania Historical and Museum Commission, Bureau for Historic Preservation, concurred in the City's conclusion of "no effect" on historical or archaeological resources. (City A.R. 0046.) According to the regulations, the City argues, no additional review by the Advisory Council on Historic Preservation ("Advisory Council") was necessary. Further, according to the City, because of the finding of "no effect," no special public meeting was required, 36 C.F.R. § 801.4(c), other than the public meetings required, and held by the City pursuant to 24 C.F.R. part 570, 36 C.F.R. § 801.8. The Court agrees.

Title 36 C.F.R. part 801 provides the regulatory framework which implements the NHPA requirements in an "expedited" fashion for UDAGs. 36 C.F.R. § 801.1(a). According to the regulations, the City as the grant applicant, rather than HUD, had the responsibility of determining whether the proposed project will have an effect on historical or archaeological sites. 31 C.F.R. § 801.2(b). The regulations mandate that the grant applicant must consult with the state historic preservation office in making this determination. 36 C.F.R. § 801.7(a)(iv). This was carried out by the City. No addi-

tional review by the Advisory Council is necessary once the City, in consultation with the state historic preservation office, determined that the project would have no effect on properties included or eligible to be included on the National Register. 36 C.F.R. § 801.3(c)(2)(i).

In short, the record shows that the City engaged in the analysis dictated by the regulations in consultation with the state historic preservation office, and in making the determination of "no effect." (City A.R. 0046–0078.) Therefore, 36 C.F.R. § 801.3(c)(2)(i) was satisfied, and no review was required by the Advisory Council, nor were any special public meetings necessary. Because the Court concludes that the City's historic review comported with the statutory and regulatory scheme, HUD's procedural oversight role is not implicated. Plaintiffs claims under NHPA, therefore, must fail.

**D.** *Validity of the City and HUD's Procedures and Regulations*

 Plaintiffs contend that HUD's regulations were invalid to the extent that they prevented plaintiffs from raising objections to the City's procedures. If so, plaintiffs argue, the provisions of the relevant statutes and regulations denied them procedural due process.[30]

HUD argues, and the Court agrees, that the record well-establishes that plaintiffs had many opportunities to raise objections.[31] The record also reflects that those objections were considered and were made part of the ERR. (*See, e.g.,* Fed.A .R. 32–35, 37, 39–42, 46–51, 55, 59–62, 64–66, 69, 70, 72, 74, 78, 80, 82, 83–88.) Plaintiffs' arguments, in essence, express frustration at their inability to convince HUD to intervene in the review process on their behalf. HUD, however, is not accorded such a mediate role because under the relevant framework, the responsibility for environmental review is delegated by HUD to the City. As a function of this dele-

---

30. *See* Complaint ¶¶ 54, 55. However, plaintiffs do not raise these contentions fully in their memorandum in support of their motion for summary judgment.

31. HUD also points to its regulations that provide opportunities to file objections to a request for release of funds ("RROF"). *See,* 24 C.F.R. §§ 58.73 (objections to release of funds), .74 (time for objecting), .75 (permissible bases for objections), .76 (procedure for objections).

gation of responsibility, the City not HUD, became responsible for the substantive compliance with the relevant statutes and regulations, and also for responding to objections from the public. *See* 24 C.F.R. § 58.77(b).[32] In other words, under the environmental delegation to the City permitted by the regulations, it became the City's role to consider the objections on behalf of HUD. Further, when HUD promulgated the environmental review delegation rules, HUD provided the required notice and comment procedure that is part of the due process required for the promulgation of regulations. *See* Proposed Rule, 60 Fed.Reg. 49,466 (1995) (proposed Sep. 25, 1995); Final Rule, 61 Fed.Reg. 19,120 (1996) (effective May 39, 1996). Upon review of the record and the applicable statutes and regulations, the Court concludes that in the course of the City's environmental review, plaintiffs were afforded the procedural protections due to them.

## IV. CONCLUSION

Through able counsel, plaintiffs have carefully combed the labyrinthian statutory and administrative framework undergirding the City and HUD's decisions in this case, for evidence of non-compliance, or, worse yet, for bad faith by public officials. After a thorough review, the Court finds that the City and HUD have complied with the applicable statutes and regulations and that the claims of bad faith do not have merit.

While sounding in the language of "procedure," at bottom, plaintiffs' grievances denote dissatisfaction with the substantive outcome of the decisions made by the City through its elected officials and with HUD's acquiescence in those decisions. Stripped to its essence, plaintiffs' complaint is addressed to the wisdom, and not the calculus of decision-making of these officials. Basic notions of federalism and separation of powers, however, counsel federal courts against altering the

results of the calculus formed by federal and local officials on the basis of the Court's disagreement with the merit of the decision. While plaintiffs have offered insightful criticism and suggested alternatives for the site of the project, in the final analysis, the Court does not sit as a zoning board of appeals empowered to adjudicate the merits of local land use disputes.

Plaintiffs have expressed their grievances often, loudly, and clearly to the decisionmakers. The decisionmakers have heard the complaints but have chosen a path different from that urged by plaintiffs. If they are dissatisfied with the decisions made by their elected officials in this case, their redress lies in the political process, at the ballot box, and not with the federal court.

An appropriate order follows.

## ORDER

**AND NOW,** this **16th** day of **September, 1998,** upon consideration of the City's motion to dismiss (doc. no. 12, 13), plaintiffs' response (doc. no. 15), the City's reply (doc. no. 18), HUD's reply (doc. no. 17), HUD's motion for summary judgment (doc. no. 34), the City's motion for summary judgment (doc. no. 35), plaintiffs' motion for summary judgment (doc. nos.36, 37) HUD's response to plaintiffs' motion (doc. no. 39), the City's response to plaintiffs' motion (doc. no. 40),and plaintiffs' reply (doc. no. 41), it is hereby **ORDERED** that:

1. Plaintiffs' motion for summary judgment (doc. no. 36) is **DENIED;**

2. Defendants' motions for summary judgment (doc. nos. 34, 35) is **GRANTED;**

3. The City's motion to dismiss (doc. nos.12, 13) is **DENIED AS MOOT;** and

---

**32.** The regulation provides:
(b) Public and agency redress. Persons and agencies seeking redress in relation to environmental reviews covered by an approved certification shall deal with the responsible entity and not with HUD. It is HUD's policy to refer all inquiries and complaints to the responsible entity and its Certifying Officer. Similarly, the State (where applicable) may direct persons

and agencies seeking redress in relation to environmental reviews covered by an approved certification to deal with the responsible entity, and not the State, and may refer inquiries and complaints to the responsible entity and its Certifying Officer. Remedies for noncompliance are set forth in program regulations. 24 C.F.R. § 58.77.

4. Judgment is **ENTERED** in favor of defendants and against plaintiffs.

**AND IT IS SO ORDERED.**