

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-17-2000

# Society Hill Towers Owners' Assn. v. Rendell

Precedential or Non-Precedential:

Docket 98-1937

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Society Hill Towers Owners' Assn. v. Rendell" (2000). *2000 Decisions.* Paper 81.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/81

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 17, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1937

SOCIETY HILL TOWERS OWNERS' ASSOCIATION,
ROBERT D. GREENBAUM; ZOE COULSON;
JOHN Q. LAWSON; JEREMY SIEGEL;
PENELOPE H. BATCHELER; GRAY SMITH;
ROXANNE GALEOTA,

          Appellants

v.

EDWARD G. RENDELL, Mayor of the City of Philadelphia;
CITY OF PHILADELPHIA; ANDREW M. CUOMO,
Secretary of Housing and Urban Development;
UNITED STATES DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 96-cv-04778)
District Judge: Honorable Eduardo C. Robreno

Argued: March 2, 1999

Before: ALITO, McKEE, Circuit Judges, and
SCHWARTZ, Senior District Judge*

(Filed: April 17, 2000)

_____

* The Honorable Murray M. Schwartz, Senior District Judge of the United
States District Court for the District of Delaware, sitting by
designation.

M. Melvin Shralow, Esq. (Argued)
White & Williams
One Liberty Place
Suite 1800
Philadelphia, PA 19103

 Attorney for Appellants

Steven A. Arbittier, Esq. (Argued)
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street
51st Floor
Philadelphia, PA 19103

 Attorney for Appellees
Edward G. Rendell, Mayor of the
City of Philadelphia and The City
of Philadelphia

Margaret L. Hutchinson, Esq.
Office of United States Attorney
615 Chestnut Street
Philadelphia, PA 19106

 Attorney for Appellees
Secretary Of Housing & Urban
Development and United States
Department of Housing And Urban
Development

OPINION OF THE COURT

McKEE, Circuit Judge.

Society Hill Towers Owners' Association and seven named
individuals[1] (collectively the "Residents") appeal from the
district court's grant of summary judgment in favor of the
City of Philadelphia and former Mayor, Edward G. Rendell
(collectively "the City"); and the United States Department
of Housing and Urban Development and its Secretary,

_____

1. Individual appellants are Robert D. Greenbaum, Zoe Coulson, John Q.
Lawson, Jeremy Siegel, Penelope H. Batcheler, Gray Smith, and Roxanne
Galeota.

2

Andrew M. Cuomo (collectively "HUD"). The Residents brought this suit under the Administrative Procedures Act ("APA"), 5 U.S.C. SS701 et seq., the National Historic Preservation Act ("NHPA"), 16 U.S.C. S 470f, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. S 4321. The Residents claimed that the City had not properly performed the environmental and historic reviews required under NEPA and NHPA prior to HUD's approval of an Urban Development Action Grant ("UDAG"), and that the City had not provided meaningful public hearings as required under 24 C.F.R. S 570.463(a) prior to submitting its fifth amendment to its previously submitted application under the UDAG program. For the reasons that follow, we will affirm.

I. Background

This dispute arose out of HUD's approval of a $10,000,000 grant application that the City had previously submitted to HUD to partially fund construction of a hotel and parking garage in the Penn's Landing area of Philadelphia. The factual background of this protracted dispute is detailed in the district court's comprehensive opinion. See Society Hill Towers Owners' Assn. v. Rendell, 20 F. Supp. 2d 855 (E.D. Pa. 1998). Therefore, we will only briefly summarize the factual and procedural history of this dispute insofar as it is helpful to our discussion.

In 1986, the City filed an application with HUD for a $10,000,000 UDAG grant to partially fund a portion of a festival park that the City intended to build at Penn's Landing. The UDAG Program was created by a 1977 amendment to Title I of the Housing and Community Development Act of 1974 ("HCDA"). 42 U. S. C.S 5301 et seq. "The purpose of the UDAG Program is to`stimulate economic development activity needed to aid in economic recovery of cities and urban areas which are experiencing severe economic distress,' by allowing such cities and counties to apply to HUD and compete for grants intended to stimulate private economic development." 20 F. Supp.2d at 863 (citing 42 U. S. C. S 5318). The application received preliminary approval from HUD, and HUD and the City executed a grant agreement later that same year.

3

Thereafter, the City submitted four amendments to the original application -- each of which was approved by HUD -- and the grant agreement was amended each time to correspond to the changes made by each amendment. However, the festival park was never constructed and the federal funds that would have been awarded under the UDAG program for that project were never dispersed.

In September 1994, the City submitted a fifth amendment to the 1986 UDAG application. That amendment abandoned the concept of a festival park, and proposed that the grant proceeds be used "solely for the construction of a 350-room hotel and 500-vehicle garage. This request for a fifth amendment constituted a`whole new project' separate and distinct from the festival park proposed in the original plan and in the previous approved amendments." Id. at 859. HUD eventually approved the requested fifth amendment in November, 1994. However, as a condition of that approval, HUD required the City to hold public hearings as required under the applicable regulations. Accordingly, the City published a notice of public hearings and, on November 21, 1994, two such hearings were held. Only thirteen people attended those hearings. Thereafter, the City notified HUD that the City had complied with the mandate for public hearings. However, a group of local residents who lived in the area of the proposed hotel-parking garage (some of whom are plaintiffs in this case) learned of the project after the November hearings were held, and they began contacting the City and HUD to register their opposition to the proposed project.2

On August 6, 1996, and August 15, 1996, after publishing notice of hearings, the City held additional hearings on the hotel-garage project. Unlike thefirst hearings, the August hearings were well attended, and the

_____

2. The residents eventually filed suit in district court to stop HUD from entering into a new agreement for dispersal of funds under the fifth amendment, but that suit was subsequently dismissed without prejudice because HUD had not approved the City's request. Accordingly, there was no final agency action, and therefore the district court did not have subject matter jurisdiction.

4

neighbors who attended expressed intense opposition to the project. However, despite the intense and vociferous opposition that was expressed at those hearings, the City published a Finding Of No Significant Impact ("FONSI") and a Notice of Intent/Request for Release of Funds ("NOI/RROF ") under the fifth amendment to its UDAG application. "On October 23, 1996, HUD informed the City that the requested fifth amendment was still defective, and `suggested' . . . that the request . . . be withdrawn and not resubmitted until the City complied with all regulatory requirements." Id. at 860. Thereafter, following publication of a second FONSI and NOI/RROF, additional public comments, and additional environmental certifications, the City did withdraw its request for a fifth amendment. However,

> [o]n that same day, the City submitted a revised request for a fifth amendment. The revised request described physically the same project as was described in the request for a fifth amendment, i.e. a 350-room hotel and 500-vehicle parking garage. While the project was substantively the same, the developer and financing arrangements were different. Together with the revised request for a fifth amendment, the City also submitted to HUD the environmental review record ("ERR").

Id. (internal citations omitted). HUD approved the City's revised request even though it was virtually identical to the request that HUD had asked the City to withdraw. Thereafter, on July 24, 1997, the Residents filed the instant suit seeking declaratory and injunctive relief. The Residents contended that the City had not afforded a meaningful opportunity for public comment on the project, and that the City had not properly conducted the necessary environmental and historic reviews. The Residents sought to enjoin UDAG funding until the City prepared an environmental impact statement ("EIS") to address the alleged deficiencies in the City's amended grant application. The Residents also sought to have the district court declare that the City had failed to conduct meaningful public hearings and had failed to properly assess the environmental impact of the project, including the impact

5

upon the affected historical district of the city. The Residents also sought to enjoin HUD and the City from executing the UDAG agreement until "all environmental and historical reviews mandated by the applicable statutes and regulations have been properly conducted." Id . at 858. Cross motions for summary judgment were filed, and the district court granted summary judgment for the defendants and against the Residents. This appeal followed.

II. The Regulatory Scheme

NEPA requires all federal agencies to prepare an environmental impact statement or EIS for major federal actions significantly affecting the quality of the environment. However, Congress authorized HUD to delegate its responsibilities for environmental review, and decisionmaking, for UDAG applications to the UDAG applicant.3 42 U.S.C. S 5304(g)(1). HUD has promulgated regulations that establish environmental review procedures for entities assuming HUD environmental review responsibilities. 24 C.F.R. 58.

HUD requires preparation of an EIS when a project is determined to have a potentially significant impact on the human environment. 24 C.F.R. S 58.37. The impact of a project upon the environment is first assessed by preparation of an Environmental Assessment ("EA"). 24 C.F.R. S 58.36. If the EA demonstrates that the project will not pose a significant environmental impact, HUD requires that a FONSI be published for public comment. 24 C.F.R. S 58.43. If considerable interest or controversy exists concerning a project, HUD requires that the public have 30 days to comment before the grant recipient can request release of funding. 24 C. F. R. S 58.46.

_____

3. In addition to assuming responsibility for environmental review under NEPA, HUD requires the grant recipient to comply with requirements that would apply to HUD relating to historic properties, floodplain management and wetland protection, coastal zone management, sole source aquifers, endangered species, air quality, farmlands protection, HUD environmental standards, and environmental justice. 24 C.F.R. S 58.5.

While NEPA does not specifically address the EA process, the Council on Environmental Quality ("CEQ") promulgated regulations for implementing NEPA that address this process and establish requirements for public participation. 40 C.F.R. S 1501.4. CEQ does not expressly require agencies to involve the public during preparation of an EA. 40 C.F.R. S 1508.9. CEQ does, however, require agencies to "hold or sponsor hearings or public meetings whenever appropriate or in accordance with statutory requirements applicable to the agency." 40 C.F.R. S 1506.6(c). In determining when a public hearing is appropriate, CEQ directs agencies to consider whether substantial environmental controversy exists concerning the proposed action or whether substantial interest exists in holding a hearing. 40 C.F.R. 1506.6(c)(1).

While public hearings may or may not be required during an EA, agencies are required to make findings of no significant impact available to the affected public. 40 C.F.R. S 1501.4(e)(1). CEQ only requires that an agency make its FONSI available for public review, however, when the proposed action is closely similar to one that normally requires an EIS or when the nature of the proposed action is one without precedent. 40 C.F.R. S 1501(4)(e)(2).

HUD promulgated regulations that establish procedures for implementing NEPA and the CEQ regulations. 24 C.F.R. Part 58. HUD's procedures do not require a grant recipient to conduct public hearings during preparation of an EA. 24 C.F.R. S 58.40. HUD only requires a grant recipient to consider holding a public hearing when an EIS is required.4

_____

4. HUD identifies factors that the grant recipients should consider in determining whether to hold public hearings during an EIS. 24 C.F.R. S 58.59(a). These factors include (1) the magnitude of the project in terms of economic costs, the geographic area involved, and the uniqueness or size of commitment of resources involved; (2) the degree of interest in or controversy concerning the project; (3) the complexity of
the issues and the likelihood that information will be presented at the hearing which will be of assistance to the responsible entity; and (4) the extent to which public involvement has been achieved through other means. Id. The Residents point to these factors to support their contention that the City was required to hold public hearings before making its decision to issue a FONSI. Appellants' Br. at 25. These factors, however, only apply to the determination of whether to hold public hearings during an EIS.

24 C.F.R. S 58.59. HUD does require, however, that FONSIs be made available for public review for 30 days when "[t]here is a considerable interest or controversy concerning the project." 24 C.F.R. S 58.46(a).

Although HUD does not require a grant recipient to conduct public hearings during the EA process, an opportunity for public participation is required as part of the general grant application process under the UDAG program.[5] 24 C.F.R. S 570.454(a). Specifically, HUD requires a grant applicant to hold public hearings prior to submission of a full application to obtain views of citizens, particularly neighbors who reside in the vicinity of the proposed project. Id. When submitting a full application for HUD to review, a UDAG applicant must include, among other things:

> The status of environmental review of the proposed project, the steps taken to notify other involved federal agencies if joint funding is requested, and a proposed timetable for the completion of any required environmental actions as described in 24 C.F.R. part 58; and

> A certification providing assurance that prior to submission of its application, it has met the citizen participation requirements of S 570.454(a) and has made the impact analysis required by S 570.454(b).

24 C.F.R. S 570.458(c)(4) & (c)(14)(i). When, as here, an applicant submits a significant amendment to a project that has previously been approved, HUD may approve the amendment if the amendment complies with all the regulatory requirements of the UDAG program. 24 C.F.R. S 570.463(b)(2).

_____

5. In 1996, HUD repealed the provisions of 24 C.F.R. pt. 570, subpt. G, relating to the application and approval of new UDAGs, characterizing these regulations as "obsolete" because no funds had been appropriated for new UDAGs for a number of years. The City and HUD agreed to use the repealed requirements as a familiar guide to ensure compliance with the statutory requirements imposed by the UDAG program. City's Brief at 10 n.4.

8

III. Standing

In the district court, the City challenged the Residents' standing in a motion to dismiss under Fed. R. Civ. P. 12(b)(1). The district court assumed that the Residents' had standing, without deciding the question, and entered summary judgment against the Residents on the merits of their claims. However, the Supreme Court has recently cautioned against the practice of assuming jurisdiction and reaching the merits of a dispute merely because a court concludes that the suit can be dismissed on the merits assuming arguendo that jurisdiction exists. In Steel Company v. Citizens for a Better Environment, 523 U.S. 83, 93 (1998), the Court noted that several Courts of Appeals "find it proper to proceed immediately to the merits question, despite jurisdictional objections, at least where (1) the merits question is more readily resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied." The Court referred to this practice as creating "hypothetical jurisdiction" and stated:

> Hypothetical jurisdiction produces nothing more than a hypothetical judgment--which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning . . . Much more than legal niceties are at stake here. The statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects . . . For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires.

Id. at 101 (citations omitted). The Court cautioned that appellate courts must avoid addressing the merits of a claim based upon an assumption that it has subject matter jurisdiction.

> On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record

9

comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it.

Id. at 94 (quoting Great Southern Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 453 (1900)). Accordingly, we begin our inquiry with a discussion of whether the Residents have standing to challenge the UDAG grant that has been awarded pursuant to the City's fifth amendment to the City's 1986 UDAG application.

We have recently summarized the requirements for Article III constitutional standing as follows:

(1) the plaintiff must have suffered an injury in fact–– an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of––the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 484–485 (3d Cir. 1998) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561 (1992)).

Here, the basis of the Residents' purported standing was well developed in the district court even though the court did not address the issue. We also asked the parties to address the issue of standing during oral argument on this appeal. Based upon the uncontested facts in this record, and the various submissions made before us, it is clear that Residents live in the Society Hill area, and enjoy the amenities of the historic district adjacent to, and included within, Penn's Landing and the Delaware River waterfront. The Residents' claims all arise from their assertion that the project for which UDAG funding is sought under the City's fifth amendment will increase traffic, pollution, and noise in the Society Hill area where they live. The Residents also argue that the project will have a detrimental effect on the ambiance of their historic neighborhood, that it will impair

10

their use and enjoyment of Penn's Landing, and that it will decrease their property values. They also claim that the project's impact is sufficiently significant to require the City to prepare an EIS, and that the City has improperly refused to take certain measures to mitigate the project's purported harm, or to adopt an alternative development as is allegedly required by the protections afforded under NEPA and NHPA.

The City argues that the Residents have not identified injuries to cognizable legal interests, and that they have failed to provide any facts to support their allegation that the proposed project will increase traffic, pollution and noise, impair their use and enjoyment of the historic district or waterfront, or decrease their property values. The City also contends that even if the Residents can satisfy the injury requirement for standing, the alleged injuries could not be redressed by a favorable ruling in this suit.

However, the City's argument against the Residents' standing conflates issues of standing and questions of proof. We think that it is clear that the Residents are alleging injury to a legally protected interest--that of maintaining the environmental and historic quality of their neighborhood. Indeed, the regulatory scheme of NEPA, HCDA and the procedural requirements for awarding UDAG grants are intended to protect those persons who would be most directly affected by a project that is to be funded from UDAG funds. If the Residents do not have standing to protect the historic and environmental quality of their neighborhood, it is hard to imagine that anyone would have standing to oppose this UDAG grant. If that is the case, the requirement for public hearings, and public input would be little more than a meaningless procedural calisthenic that would provide little or no protection to those most directly affected by the governmental action -- the people who live in the vicinity of a federally funded project, and whose lives are most directly impacted by the expenditure of UDAG funds.

The Residents have alleged concrete and particularized injury in the form of increased traffic, pollution, and noise that will detrimentally impact the ambiance of their historic neighborhood and their ability to use and enjoy the Penn's

11

Landing waterfront. They assert that the impact of the proposed project on their neighborhood will decrease their property values. There is no assertion that these claims are disingenuous or that the Residents claim these injuries merely to manufacture a jurisdictional case or controversy that would not otherwise exist. Moreover, the interest of the Residents is anything but manufactured. It is as real as it is fervent, and it is sufficient to give the Residents standing to challenge the requested UDAG grant.6  The City counters the Residents' claims in part, by reminding us that the City's obligation is to all of the residents of Philadelphia, and not just to those people who live near Penn's landing. The City quite properly notes that it is

> charged with making decisions that benefit the city as a whole; both the architect who surveys Penn's Landing from his [or her] 15th story window at Society Hill Towers and the Port Richmond steelworker who could support his [or her] family for a year working on the Project. After five years, one mayoral election [now two] and the ceaseless drumbeat of Plaintiffs' opposition, the City Defendants still believe that the Project is in the best interests of all of the residents of the city.

_____

6. Indeed, the City's own brief substantiates the Residents' fervor, and the depth of their interest in the outcome of the City's UDAG application. The City notes:

> The Plaintiffs oppose the Project and have commenced three separate lawsuits to stop it. They have prosecutedfive appeals to keep two of those lawsuits alive. They have protested, collected signatures and written letters. They have testified at public hearings. . . ."

City's Br. at 4. Of course, the intensity of a party's opposition can not, by itself, create a case or controversy in the absence of a significant interest in the outcome that is sufficient to confer subject matter jurisdiction under Article III. However, the intensity of the Residents' opposition here is relevant to an evaluation of whether they have a sufficient interest in the outcome to have standing. We think it obvious that their interest in the City's UDAG application is genuine, and the nexus between the challenged conduct and their asserted injuries is sufficiently immediate to establish standing.

12

City's Br. at 4. We recognize the sincerity of the City's assertion of its obligation to all of the city's residents. However, that duty does not lessen or alter the particular interest that the Residents have in this UDAG application. In a very real sense, it is their neighborhood that is being impacted by this federal expenditure, and not that of the illustrative, hypothetical steelworker in Port Richmond. Though the latter has an interest in the project, the interest of the Residents is qualitatively different, and far more immediate and focused. They are not raising "a generally available grievance about government--claiming only harm to [their] and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits [them] than it does the public at large." Lujan v. Defenders of Wildlife, 504 U.S. 555, 573–574 (1992). It is not mere hyperbole to proclaim that this project "hits them where they live." Thus, the Residents have demonstrated an interest in the City's fifth amendment to its UDAG application that more than satisfies the first prong of Article III standing.

The Residents also meet the causation and redressibility prongs of Article III standing. The injury alleged by the Residents would directly result from construction of the proposed project. Moreover, the alleged injury may well be redressed if the City is required to more fully evaluate the environmental and historic impacts of the proposed project, and take appropriate action to mitigate any identified detrimental impacts of the project.

The concept of standing implicates prudential considerations that overlap, but extend beyond our inquiry under Article III. We have summarized those prudential principles as follows:

> (1) the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties; (2) even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Article III, the federal courts will not adjudicate abstract questions of wide public significance which amount to generalized grievances pervasively shared and most appropriately addressed in the respective branches; and (3) the

13

plaintiff 's complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in questions.

Trump Hotels, 140 F.3d at 485 (citations and internal quotations omitted). As noted above, the Residents are asserting their own legal interests; they are not raising an abstract question of wide public significance, and their interest is within the zone of interests protected by NEPA and NHPA. We, therefore, find that the Society Hill Residents have standing to bring this suit.

IV. Standard of Review

The Residents contend that the district court erred in granting summary judgment for the City and HUD on the Residents' APA, NEPA and NHPA claims. Our review of the district court's grant of summary judgment is plenary. Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 590 (3d Cir. 1998). In their claim under the APA, the Residents contend that the City's environmental review of the UDAG project and HUD's approval of the City'sfifth amendment to its UDAG application are arbitrary and capricious and fail to comply with NEPA. The Residents also allege that the City failed to provide for meaningful public participation in the UDAG application review process, failed to consider the cumulative impacts of proposed development in the Penn's Landing area, failed to consider appropriate alternatives, and failed to properly weigh the public controversy surrounding the project in deciding whether an environmental impact statement was required.

The Supreme Court has summarized the standard of review we must apply in an appeal under the APA as follows:

> [T]he generally applicable standards of S 706 require the reviewing court to engage in a substantial inquiry. Certainly, the [agency's] decision is entitled to a presumption of regularity. But that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review. The court is first required to decide whether the [agency] acted within the scope of

14

> [its] authority . . . Scrutiny of the facts does not end,
> however, with the determination that the [agency] acted
> within the scope of [its] statutory authority. Section
> 706(2)(A) requires a finding that the actual choice
> made was not arbitrary, capricious, an abuse of
> discretion, or otherwise not in accordance with law. To
> make this finding the court must consider whether the
> decision was based on a consideration of the relevant
> factors and whether there has been a clear error of
> judgment. Although this inquiry into the facts is to be
> searching and careful, the ultimate standard of review
> is a narrow one. The court is not empowered to
> substitute its judgment for that of the agency. Thefinal
> inquiry is whether the [agency's] action followed the
> necessary procedural requirements.

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402,
415–417 (1971) (citations omitted).

The dispute here centers in large part upon the City's
conclusion that it need not prepare an EIS, based upon its
Finding of No Significant Impact at the conclusion of its
Environmental Assessment. Although it is clear that we
review HUD's approval of the UDAG application to
determine if it is arbitrary and capricious, it is not as clear
that the same standard applies to our review of the City's
decision to forego preparation of an EIS based upon its
FONSI. However, in Marsh v. Oregon Natural Resources
Council, 490 U.S. 360 (1989), the Supreme Court reviewed
an agency decision to forego preparation of a supplemental
EIS under the arbitrary and capricious standard. Here, the
district court relied upon Marsh in applying that standard
of review to its scrutiny of the City's decision to not prepare
an EIS. Other Courts of Appeals that have addressed this
issue have interpreted Marsh as applying the arbitrary and
capricious standard to a review of an administrative
decision to not prepare an EIS based upon a FONSI. See
Lockhart v. Kenops, 927 F.2d 1028, 1032 (8th Cir.), cert.
denied, 502 U.S. 863 (1991), and Sabine River Authority v.
U.S. Dept. of Interior, 951 F.2d 669, 677–78 (10th Cir.). We
believe the district court was correct in adopting that
standard of review, and it is the standard we will apply
here.

15

A. Compliance with Public Participation
      Requirements.

The Residents raise both procedural and substantive
issues with the manner in which the City conducted public
hearings on the proposed project. Procedurally, the
Residents contend that HUD regulations required the City
to hold public hearings before the City submitted its
amended grant application and before the City decided
whether the project had a significant environmental impact.
Appellants' Brief at 20. The Residents further contend that,
even though the City purported to hold public hearings,
those hearings did not comply with the substantive public
participation requirements because the City had already
decided to proceed with the project and never gave any
consideration to the opposition that was voiced during the
public hearings.

Applicants for UDAG grants are required to hold public
hearings prior to applying for a grant in order to obtain the
general views of citizens and neighboring residents,
particularly those of low and moderate income. 24 C.F.R.
570.454(a) & (b). HUD also requires grant applicants to
allow the public to review an applicant's FONSI. 24 C.F.R.
S 58.46. Here, the City held public hearings on the
proposed project and provided an opportunity for the public
to review its FONSI at the conclusion of the City's EA.
However, the Residents contend that these "hearings" were
little more than a charade. They argue that the City did not
provide for meaningful public participation because the
hearings were held after the UDAG application had been
submitted to HUD.7 In support of their claim that the City
never had any intention of considering public comments,
the Residents assert that the Executive Director of the City
Planning Commission stated that the project was a"done
deal" before public hearings were held. Similarly, the
Residents point to testimony that the Vice President of the

_____

7. As noted above, this application was actually the fifth amendment to
a UDAG application first approved by HUD in 1986 to partially fund a
festival park at Penn's Landing. Because this amendment proposed a
completely new project, the City was required to comply with all the
requirements of the UDAG program. 24 U.S.C. 570.463(b)(2).

Philadelphia Industrial Development Corporation ("PIDC") confirmed that the project was a "done deal as far as local politics are concerned" prior to any hearings on the UDAG application. Appellants' Br. at 24. Thus, according to the Residents, the City's act of withdrawing its priorflawed application and resubmitting a virtually identical one as its "fifth amendment" could not cure the regulatory and statutory defects in the City's UDAG application.

Although the statutory and regulatory scheme pertaining to UDAG grants require public hearings prior to submission of an application, nothing in the regulations prevent an applicant from curing a procedural defect in a UDAG application by withdrawing the defective application, curing the defect, and then resubmitting the application. That is what occurred here. The initial application and earlier amendments were submitted without proper public notification and hearings. The prior amendment was withdrawn, hearings were held, and the application was then resubmitted. Under the circumstances, we understand why the Residents might feel that their opposition fell upon deaf ears even though they were finally able to voice it. However, the record here is to the contrary. It shows that the City did not totally ignore the concerns of neighborhood residents, though those concerns were clearly not addressed to the extent, or in the manner, that the Residents would have liked. Accordingly, as we discuss more thoroughly below, we can not conclude that the decision to forego an EIS was "arbitrary or capricious" or "without observance of procedure required by law" under the APA. 5 U.S.C. S 706(2).

B. The Cumulative Impact of the Project
        on the Neighborhood.

As noted above, CEQ regulations provide the framework for how cumulative impacts are to be addressed in an EA. When an EA concludes with a FONSI, an agency is required to briefly present why an action will not have a significant impact on the human environment. 40 C.F.R. S 1508.13. CEQ identifies factors that should be considered in determining whether an impact is significant. 40 C.F.R. S 1508.27. Although the impact of a particular project may

17

be inconsequential when considered in isolation, if the cumulative impact of a given project and other planned projects is significant, an applicant can not simply prepare an EA for its project, issue a FONSI, and ignore the overall impact of the project on a particular neighborhood. 40 C.F.R. S 1508.27(b)(7). Thus, CEQ directs agencies to consider:

> Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

Id. CEQ defines "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. S 1508.7. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. Id . HUD directs entities conducting environmental reviews to "group together and evaluate as a single project all individual activities which are related either on a geographical or functional basis, or are logical parts of composite of contemplated actions." 24 C.F.R. S 58.32(a).

In Kleppe v. Sierra Club, 427 U.S. 390 (1976) the Supreme Court addressed the question of when the cumulative impact of other projects must be included in an environmental analysis. The Court stated "when several proposals for [ ] actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." Id . at 410. The Court noted however, that the concept of "cumulative impact" was not intended to expand an inquiry into the realm of the fanciful.

> The statute, however, speaks solely in terms of proposed actions; it does not require an agency to

18

consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated action later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects.

Id. at 410 n.20. In National Wildlife Federation v. FERC, 912 F.2d 1471, 1478 (D.C. Cir. 1990), the Court of Appeals for the D.C. Circuit amplified the holding in Kleppe as follows:

Kleppe thus clearly establishes that an EIS need not delve into the possible effects of a hypothetical project, but need only focus on the impact of the particular proposal at issue and other pending or recently approved proposals that might be connected to or act cumulatively with the proposal at issue.

In Sierra Club v. Froehike, 534 F.2d 1289, 1297 (8th Cir. 1976), the Court of Appeals for the Eighth Circuit summarized the then existing case law pertaining to "segmentation" -- another term for expressing the cumulative impact of a project. The court stated:

Where it is found that the project before the court is an essentially independent one, an EIS for that project alone has been found sufficient compliance with the act. In such a case there is not irretrievable commitment of resources beyond what is actually expended in an individual project.

Similarly, in Webb v. Gorsuch, 699 F.2d 157, 161(4th Cir. 1983), the court concluded:

Generally, an administrative agency need consider the impact of other proposed projects when developing an EIS for a pending project only if the projects are so interdependent that it would be unwise or irrational to complete one without the others.

That standard was adopted by the Court of Appeals for the Tenth Circuit in Park County Resource Council v. USDA, 817 F.2d 609, 623 (10th Cir. 1987), overruled on other grounds, Village of Los Ranchos De Albuquerque v. Marsh,

956 F.2d 970, 973 (10th Cir. 1992), and Airport Neighbors Alliance v. U.S., 90 F.3d 426, 433 (10th Cir. 1996). In Airport Neighbors Alliance, the court found that the remaining components of the airport's master plan were not "so interdependent that it would be unwise or irrational to complete the Runway 321 upgrade without them." Id. Accordingly, the court held that the FAA had not "inappropriately ignored cumulative impacts when it failed to analyze extensively the remaining components of the Master Plan in the EA." The court reasoned that,"requiring a cumulative EIS analyzing possible future actions postulated in a twenty-year Master Plan that are far from certain would result in a `gross misallocation of resources, would trivialize NEPA and would diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment.' " Id. at 431 (quoting Park County, 817 F.2d at 623).

Similarly, under circumstances analogous to those presented here, the Court of Appeals for the Fifth Circuit concluded that the City of New Orleans appropriately limited its environmental review under the UDAG program to a proposed hotel, retail and parking development. Vieux Carre Property Owners v. Pierce, 719 F.2d 1272 (5th Cir. 1983). The court concluded that other phases in the City's Master Plan for the area affected by the UDAG grant project (Phases III through V) were "indefinite and speculative in nature; [as] no final plans nor private funding commitments exist as to Phases III through V, and no further design work or land acquisition as to Phases IV and V has been performed since 1978." Id. at 1275. Although we realize that some courts have adopted a more expansive approach to requiring a UDAG applicant to determine cumulative impact, we agree with the holding in Webb that such a determination must be governed by considerations of whether other projects are so "interdependent that it would be unwise or irrational to complete one without the others."8

_____

8. See LaFlamme v. FERC, 852 F.2d 389 (9th Cir. 1988). There, the court concluded that the applicant's finding of no potential for adverse cumulative impact on the environment could not be sustained because the applicant "[had] not considered the impact that all past, present, and reasonably foreseeable future projects may have on the basin's resources, . . .." Id. at 402.

Webb, at 161. However, we believe that a court must also consider the likelihood that a given project will be constructed along with the interdependence of other projects. The more certain it is that a given project will be completed, the more reasonable it is to require a UDAG applicant to consider the cumulative impact of that project and the applicant's project in determining the applicant's obligations under the applicable regulations.

The Residents contend that the City's EA was deficient because the City did not consider the impact of future development that had been identified in several planning documents9 including a proposed "mega" entertainment complex planned at Penn's Landing. However, projects that the City has merely proposed in planning documents are not sufficiently concrete to warrant inclusion in the EA for the hotel/parking garage project at issue here. The district court correctly focused upon the likelihood that the other projects will be completed as well as the interdependence of the hotel/parking-garage and those other projects. In doing so it stated:

> First, the Court notes that the evidence does not suggest that the City could not sever any connection between the hotel and other projects without destroying the proposed action's functionality. Second, plaintiffs do not point to any evidence in the administrative record that realization of the future plans was, indeed, expected to materialize. NEPA only requires consideration of the cumulative impact of proposed, and not merely contemplated future actions. Where future development is unlikely or difficult to anticipate there is no need to study cumulative impacts. Thus, the Court concludes that based on the record, the City was not required to conduct a cumulative impact analysis as part of the EA.

_____

9. The Residents point to six plans referenced by the City in its environmental assessment: the Comprehensive Land Use Plan; the Plan for Center City; the Penn's Landing Master Plan; the Penn's Landing Development Plan; the Central Riverfront District Plan; and the River Walk Plan.

20 F. Supp. 2d at 870 (citations and internal quotations omitted). Although an EA may need to include a cumulative impact analysis even if it is practical to sever any connection between a project and other projects if it is sufficiently certain that such other projects will be constructed, we nevertheless agree with the district court's analysis here.[10] It is not at all certain that the proposed "mega" entertainment complex or any of the projects included in the planning documents will ever be completed.

Moreover, even if the Residents could establish that these projects were going to be completed, that finding would not undermine the City's FONSI because the district court concluded that those projects and the hotel/parking garage are not sufficiently interdependent. The success of a hotel and parking garage in the Penn's Landing is not tied to construction of an entertainment complex. Moreover, plans for the Penn's Landing area appear to change regularly. Given the circumstances here, the City should not be required to evaluate and reevaluate the environmental impacts of such projects as part of the EA for this UDAG application with every change in the plans for development of Penn's Landing no matter how tenuous the contemplated project may be.

C. Alternatives to the Project.

NEPA requires all Federal agencies to "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. 4331(2)(E). The CEQ regulations require that EAs include a brief discussion of the need for the proposal, of alternatives as required by section 102(2)(E) of NEPA, and of the environmental impacts of the proposed actions and alternatives. HUD regulations require an EA to "[e]xamine and recommend feasible ways in which the project or external factors relating to the project could be modified in

_____

10. "[W]e do not propose to attempt the impossible, namely, the enunciation of a general rule that will cover all cases. The crucial dependence is upon the facts before the court in the particular case sub judice." Sierra Club v. Froehike, 534 F.2d 1289, 1297 (8th Cir. 1976).

order to eliminate or minimize adverse environmental impacts" and "[e]xamine alternatives to the project itself, if appropriate, including the alternative of no action." 24 C.F.R. S 58.40(d) & (e).

The Residents contend that the City's finding of no significant impact is arbitrary and capricious because the City improperly rejected an alternative location for the project. Appellants' Br. at 41. The Residents urged the City to consider locating the proposed hotel just south of the foot of Market Street. Id. The Residents contend that location is better suited for a hotel because it is a larger site which will allow a structure with a larger footprint and a lower overall profile, while providing the same total capacity without leading traffic directly into the narrow streets of Society Hill via Dock Street. Id. The Residents state, and the City does not dispute, that the City rejected the alternative location because the Development Plan adopted by the City Planning Commission prohibits the construction of structures at the ends of various streets to protect east-west views from Center City to the river, the location would have a closer proximity to resources listed on the National Register of Historic Places, and the alternative location would have required alteration or relocation of several interceptor sewers at significant cost. Id. The Residents contend that these reasons are not legitimate, however, because the City has planned since 1963 to build a 50-story office tower at the alternative location. Id.

NEPA only requires that appropriate alternatives be considered. 42 U.S.C. S 4332(2)(E). NEPA does not mandate that any particular alternative be selected during an EA. See Limerick Ecology Action, Inc. v. Nuclear Regulatory Commission, 869 F.2d 719, 730 n.9 (3d Cir. 1989)(NEPA imposes procedural requirements, not substantive outcomes). The City did consider the alternative proposed by the Residents and the City provided reasons for not selecting that alternative location. While the City did not select the location preferred by the Residents, the City notes that new traffic analyses were conducted and included in the record in response to concerns raised during the public comment period. The Residents would have us view the City's reasons for not selecting the

23

alternate location as arbitrary and capricious because the City allegedly has had plans for over 25 years to build a larger structure at this same location near the foot of Market Street. The Residents have not shown, however, that the City actually intends to build that structure.

D. The Controversial Nature of the UDAG Application.

Under a heading entitled: "The Public Outcry Demands Preparation of an EIS," the Residents argue,"[e]xistence of a public controversy relating to a project is a factor that an agency should consider in assessing whether to prepare an EIS." Appellants' Br. at 43. The CEQ identifies ten factors that should be considered in determining if a project's impact is so significant that an EIS is required, and one of these factors is the degree to which the effects on the quality of the human environment are likely to be highly controversial. 40 C.F.R. S 1508.27(b)(4). However, in Hanly v. Kleindienst, 471 F.2d 823, 830 (2d Cir. 1972), the court states:

> [T]he term `controversial' apparently refers to cases where a substantial dispute exists as to the size, nature or effect of the major federal action rather than to the existence of opposition to a use, the effect of which is relatively undisputed . . . The suggestion that `controversial' must be equated with neighborhood opposition has also been rejected by others.

Here, the Residents have not raised a substantial dispute regarding the environmental effects identified by the City in its EA for this project. Rather, the controversy here centers on the Residents' opposition to the City's choice of location for the project. Moreover, even if the issues that the Residents raise could be deemed to raise a "controversy" under the regulations, it is important to note that the existence of a controversy is only one of the ten factors listed for determining if an EIS is necessary. Given the nature of the "controversy" involved and the fact that degree of controversy is only one of ten factors to be considered in determining whether a significant impact is present, we can not conclude that the City's decision to issue a FONSI was arbitrary and capricious.

24

V. Approval Under NHPA

Finally, the Society Hill Residents contend that the district court erred in granting summary judgment to the City and HUD on the Residents' claim under NHPA.

Regulations implementing NHPA are set forth in 36 C.F.R. S 800 et seq. The regulations include specific requirements for implementing NHPA under the UDAG program.  36 C.F.R. S 801. The UDAG regulations provide that the UDAG applicant, rather than HUD, must comply with the regulations. 36 C.F.R. S 801.2(b). A UDAG applicant is required to identify National Register properties, and properties that may meet the criteria for listing on the National Register, that may be affected by the project. 36 C.F.R. S 801.3(b). The applicant is also required to determine the effect of the project on these properties pursuant to criteria set forth in the regulations. 36 C.F.R. S 801.3(c).

If an applicant determines that the project will have no effect on any identified historic properties, the project requires no further review by the Advisory Council on Historic Preservation (hereinafter "Council") "unless a timely objection is made by the Executive Director." 36 C.F.R. S 801.3(c)(2)(i) (emphasis added). An applicant is required to seek comments from the Council to satisfy the applicant's responsibilities under section 106 of NHPA. 36 C.F.R. S 801.4. The regulations require the following:

> Upon receipt of a Determination of No Adverse Effect from an applicant, the Executive Director will review the Determination and supporting documentation required by S 801.7(a). Failure to provide the required information at the time the applicant requests Council comments will delay the process. The Executive Director will respond to the applicant within 15 days after receipt of the information required in S 801.7(a). Unless the Executive Director objects to the Determination within 15 days after receipt, the applicant will be considered to have satisfied its responsibilities under section 106 of the Act and these regulations and no further Council review is required.

25

36 C.F.R. S 801.4(b)(1). The documentation required to support a Determination of No Adverse Effects includes:

(i) A general discussion and chronology of the pro posed project;

(ii) A description of the proposed project includi ng, as appropriate, photographs, maps, drawings and specifications;

(iii) A copy of the National Register form or a co py of the Determination of Eligibility documentation for each property that will be affected by the project including a description of each property's physical appearance and significance;

(iv) A brief explaining why each of the Criteria o f Adverse Effect (See statement S 801.3(c)(1)) was found inapplicable;

(v) Written views of the State Historic Preservati on Officer concerning the Determination of No Adverse Effect, if available; and,

(vi) An estimate of the cost of the project includ ing the amount of the UDAG grant and a description of any other Federal involvement.

36 C.F.R. S 801.7(b)(1).

During oral argument we expressed our concern that the record did not reflect that the City had afforded the Advisory Council for Historic Preservation an opportunity to respond to the City's finding that the UDAG project would have no adverse affect on the nearby historic district and we asked the parties to submit documentation to support their respective contentions on this issue. See 16 U.S.C. S 470f. The City responded in a letter in which it asserted that review by the Advisory Council was not required under 36 C.F.R. pt. 801 ("Part 801") because HUD had delegated the responsibility for assessing the project's impact on the historic district to the City, and the City had determined that there was no impact.

In response, the Residents agreed with the City's assertion that the applicant's determination of no effect eliminates the necessity for further review by the Council

26

"unless a timely objection is made by the Executive Director," 36 C.F.R. S 801.3(c)(2)(I). However, the Residents argued that: the City's determination of no impact was never submitted to the Executive Director; the City never made a determination of no effect on any National Register property under NHPA (as distinct from any review under NEPA); and the Pennsylvania Historical and Museum Commission failed to make its views known as is required under 36 C.F.R. S 801.3(b)(5), as the Commission "merely accepted the findings of the City's Historical Preservation Officer;" and that the Philadelphia Historical Preservation Officer "was demonstrably wrong when he found that a visual barrier protected Society Hill and Old City from the visual impact of the hotel tower and garage wall." However, in their brief on appeal, the Residents' only asserted the following challenge to the City's failure to seek approval of the Advisory Council:

> The District Court concluded that the City met its delegated responsibility under the NHPA which made review by the Advisory Council unnecessary.
>
> The record, however, shows that the findings on historical impact were based upon the City Historical Preservation Officer's belief that "construction along Front Street obstructs the view of the proposed hotel from the historic district," and that the result of this "visual barrier" is that "the proposed hotel development on Penn's Landing will have no effect on the Society Hill National Historic District."
>
> This conclusion is clearly erroneous. . . .

Appellants' Br. at 47. Accordingly, the allegations of error asserted by the Residents in their letter, other than the assertion that the findings on historical impact were clearly erroneous, have been waived and we will not now address them.11

_____

11. We note that NHPA appears to require that the appropriate agency or the applicant (where, as here, the agency delegates compliance to the applicant) obtain the review of the Advisory Council. NHPA states that the appropriate agency:

27

Although the Residents clearly disagree with findings pertaining to the line of sight of the proposed project, and the project's impact on the historical district, those findings are not clearly erroneous. Accordingly, we conclude that the district court did not err in holding that no further authorization from the Advisory Council was required.

## VI.

Accordingly, for the reasons set forth above, we will affirm the district court's grant of summary judgment to the City and HUD on the Residents' APA, NEPA and NHPA claims.

A True Copy:
     Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

> shall, prior to the expenditure of any federal funds on [an] undertaking . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. S 470f (emphasis added). Accordingly, the procedure authorized under 36 C.F.R. S 801.3(c)(2)((i) appears to be inconsistent with the statute. However, as noted above, the Residents did not raise this issue in their opening brief and we will not now address it. See Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994)("An issue is waived unless a party raises it in its opening brief. . . .").

28